UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| Marilyn W. Dodd,<br>　　　　　Plaintiff,<br><br>v.<br><br>TransUnion, LLC; Bank of America, National Association; and DOES 1 through 100 inclusive,<br><br>　　　　　Defendants. | CASE NO. 5:22-cv-686 |

COMES NOW Plaintiff **MARILYN W. DODD** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting.

2. Defendant Bank of America, National Association ("BOA") is reporting an unauthorized account on Plaintiff's TransUnion, LLC ("TransUnion") credit report which includes derogatory notations. This account is detrimental to Plaintiff's creditworthiness, Credit Score, and her ability to obtain new credit. Plaintiff is neither an obligor nor authorized user on the account.

3. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4. Creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting debt information. Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

5. This was not the intent of Congress when it enacted the Fair Credit Reporting Act.

## JURISDICTION & VENUE

6. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

7. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

8. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

9. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

10. Plaintiff alleges she revoked her authorized user status, if any was previously given, on the BOA account; however, BOA is reporting the account on her TransUnion report as charged off.

11. Plaintiff alleges the BOA tradeline contains derogatory reporting which is lowering her Credit Score and her ability to obtain new credit.

12. Plaintiff alleges the maker of the BOA account is deceased.

13. Plaintiff alleges she is not the maker of the BOA account and it should not be reported on her credit report.

14. Plaintiff alleges that each and every Defendant is familiar with FCRA requirements and subscribes thereto.

15. Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

16. Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair her Credit Score.

17. In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

18. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  FICO, Inc.**

19. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

20. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions. [1]

21. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

22. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

23. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

24. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

25. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

26. The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

27. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See https://www.myfico.com* (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

28. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

29. Each of the five (5) factors is weighted differently by FICO.

30. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

31. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

32. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

33. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

34. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

35. A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

36. Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.   e-OSCAR**

37. e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

38. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

39. The ACDV contains codes next to certain data fields associated with a credit file.

40. When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

41. When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

42. For clarification, an AUD, or other regular transmission, is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**C.   Plaintiff's Credit Report Contain an Inaccurate and Adverse Tradeline, which Plaintiff Disputed to no Avail**

43. On February 3, 2022, Plaintiff ordered a TransUnion credit report to ensure proper reporting by Plaintiff's creditors (the "February 3 Credit Report").

44. Plaintiff noticed an adverse tradeline in her February 3 Credit Report, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

45. Plaintiff then disputed the inaccurate tradeline regarding the BOA account via certified mail to TransUnion on or about March 9, 2022 (the "Dispute Letter").

46. Plaintiff's Dispute Letter specifically put BOA on notice that she did not consent to having the account reported, revoked any authorized user consent previously given, and the reporting should be updated.

47. Plaintiff's Dispute Letter also detailed what was perceived to be problematic about the account, addressing each tradeline individually.

48. Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

49. Plaintiff is informed and believes that TransUnion received Plaintiff's Dispute Letter and, in response, sent Plaintiff's dispute to BOA, as the data furnisher, via an ACDV through e-OSCAR.

50. On April 21, 2022, Plaintiff ordered a second TransUnion credit report to determine if her account was updated.

    a.    **Inaccuracy – BOA**

51. Despite actual knowledge, BOA continued to report another consumer's account, beginning in XXXX, to TransUnion as if Plaintiff was the maker. This account has a payment status of "Charged off as bad debt" as of September 2021.

52. Reporting an authorized user account after the authorized user designation has been revoked is patently incorrect. As this tradeline includes derogatory information, the fact that it is showing on Plaintiff's credit report is lowering her Credit Score, and it is misleading to an extent to adversely affect credit decisions.

53. BOA is not even reporting the account as if Plaintiff was an authorized user. This makes it appear as if she is liable on the account and it was charged off. This reporting is patently incorrect and misleading.

54. BOA did not update the reporting to delete the unauthorized account.

55. Furthermore, the maker of this BOA account is deceased; therefore, the account should have been removed from Plaintiff's credit report on this basis alone.

56. TransUnion provided notice to BOA that Plaintiff was disputing the inaccurate and misleading information, but BOA failed to conduct a reasonable investigation of the information as required by the FCRA.

57. The most basic investigation would include a simple review of internal documentation on the account (i.e., the fact Plaintiff had revoked authorized user status, if any had

been given, and the maker on the account is deceased) compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

58. Plaintiff alleges that BOA did not review if its reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or its own internal records concerning Plaintiff's responsibility on the account.

59. If BOA reviewed such standards, or its own internal records regarding Plaintiff's responsibility on the account, BOA would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

60. By continuing to report the account to TransUnion as described in paragraph 51, it incorrectly appears to third parties viewing Plaintiff's credit report that Plaintiff is the maker on the account, which is inaccurate. Further, even if she was listed as an authorized user, since the maker is deceased and she revoked her authorized user status, its reporting is still inaccurate.

61. In addition, as this severely derogatory account is being used to calculate Plaintiff's Credit Score, the credit score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

62. The lack of investigation and reporting of inaccurate and incomplete information by BOA is unreasonable.

**D.    Damages**

63. Plaintiff pulled the credit reports at issue at a cost for access to the reports, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

64. As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

65. Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by BOA. Plaintiff's diminished creditworthiness, resulting from BOA's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

66. BOA's actions, as alleged herein, are each in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

## FIRST CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))

### (Against Defendants and Does 1-100)

67. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  TransUnion Failed to Assure Credit Reporting Accuracy**

68. TransUnion violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

69. Had TransUnion maintained reasonable procedures to assure maximum accuracy, it would have never reported the BOA account as described herein.

70. TransUnion knew, or should have known, that (1) Plaintiff revoked her authorized user status on the BOA account, (2) the tradeline was derogatory and detrimental to Plaintiff's Credit Score, and (3) as Plaintiff was not responsible on the account and had revoked her user status, that the account should not be showing on her credit report. Further, TransUnion knew, or should have known, that continuing to report the account does not reflect maximum possible accuracy and completeness as required by the FCRA.

71. Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019). The investigation and evaluation of Plaintiff's creditworthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the inaccurate reporting TransUnion allowed.

72. As a result of TransUnion's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

**B.  Willful Violations**

73. TransUnion's violations, as described herein, were willful; specifically, TransUnion has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

74. TransUnion regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the disputes. Additionally, TransUnion regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

75. To the extent TransUnion does send consumer disputes, it sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

76. TransUnion's employees receive little to no training concerning how to accurately report consumer debt.

77. Instead, TransUnion's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

78. TransUnion's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

79. TransUnion has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

80. As a result of TransUnion's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

81. TransUnion's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

82. In the alternative, TransUnion was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

83. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))
### (Against Defendants and Does 1-100)

84. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

### A.  BOA Failed to Reinvestigate Following Plaintiff's Dispute

85. Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

86. Despite having revoked her authorized user status directly to BOA, BOA sent an AUD or monthly transmission to TransUnion reporting the account as charged off and as if Plaintiff was liable for the account.

87. After receiving the Plaintiff's Dispute Letter and revocation letter, BOA did not delete the unauthorized tradeline on the TransUnion credit report. Instead, despite having knowledge of Plaintiff's revocation, and notice that the maker on the account is deceased, BOA verified and re-reported the tradeline to TransUnion via ACDV as if Plaintiff was the maker and as if the account was charged off.

88. BOA violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation at all or by failing to conduct a reasonable investigation, and under either event, re-reporting misleading and inaccurate account information.

89. TransUnion provided notice to BOA that Plaintiff was disputing the inaccurate and misleading information; however, BOA failed to conduct a reasonable investigation as required by the FCRA.

90. Based on Plaintiff's dispute, BOA should have known the account was not authorized and should have ceased its inaccurate reporting.

91. It is undisputable that the BOA account in question contains derogatory notations, that Plaintiff was merely an authorized user on the account, and that the maker of the account is deceased. Reporting an authorized user account on a consumer's report when they have revoked their right to be one is patently incorrect. Reporting an authorized user account on a consumer's report as if they were personally liable for the debt is patently incorrect.

92. In addition, this inaccurate reporting also adversely affects credit decisions. Derogatory marks, such as a charge off payment status, goes into calculating a credit score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported credit score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, BOA's reporting as described

herein has a direct adverse effect on Plaintiff's Credit Score and her ability to rebuild her Credit Score and obtain new credit.

93. The lack of investigation by BOA, as required by the FCRA, is unreasonable.

**B.     Willful Violations**

94. Plaintiff alleges that BOA has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

95. Plaintiff further alleges that BOA has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, has developed reckless policies and procedures.

96. Plaintiff alleges that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, BOA's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

97. BOA's reporting is willful as it was directly told, in addition to Plaintiff's dispute, that Plaintiff revoked her authorized user status. BOA also has knowledge that the maker on the account is deceased, and that Plaintiff is not personally liable on the account. Given these facts, BOA's reporting of an unauthorized derogatory account can only be in order to injury Plaintiff's creditworthiness.

98. In the alternative, BOA was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

**C.     TransUnion Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

99. Pursuant to 15 U.S.C. § 1681i(a)(1), TransUnion was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the BOA account.

100. Thus, TransUnion failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the account within the statutory time frame.

101. TransUnion is not a passive entity bound to report whatever information a data furnisher provides.

102. Plaintiff alleges TransUnion is readily familiar with FCRA requirements and credit reporting industry standards.

103. Based on the foregoing, Plaintiff alleges that TransUnion can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

104. TransUnion can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

105. TransUnion failed to conduct a reasonable investigation because any basic investigation would have uncovered that BOA was not reporting its account at issue correctly.

106. Had TransUnion conducted a proper investigation, it could have suppressed the BOA debt from reporting on Plaintiff's credit report. However, TransUnion continued to report the account as described herein.

107. TransUnion, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

108. In the alternative, Plaintiff alleges that TransUnion did not send an ACDV to BOA to confirm accurate reporting on its account. Despite receiving the Dispute Letter providing notice of the inaccuracies, TransUnion did not delete or correct the tradeline or conduct an investigation.

109. In the alternative, if TransUnion deemed Plaintiff's Dispute Letter "frivolous or irrelevant" under 15 U.S.C. § 1681i(a)(3), TransUnion failed to notify Plaintiff of such determination as required by 15 U.S.C. § 1681i(a)(3)(B). As Plaintiff received no such notice from TransUnion, Plaintiff alleges TransUnion deemed her Dispute Letter valid, and thus triggered its obligations under 15 U.S.C. § 1681i(a)(1) and (2)(A), for which it did not comply.

## THIRD CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
### (Against Defendants and Does 1-100)

110. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  TransUnion Failed to Review and Consider all Relevant Information**

111. TransUnion violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

112. TransUnion's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

113. TransUnion's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

114. In the alternative, TransUnion was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

115. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### FOURTH CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
### (Against Defendants and Does 1-100)

116. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    TransUnion Failed to Delete Disputed and Inaccurate Information**

117. TransUnion violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

118. TransUnion's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

119. TransUnion's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

120. In the alternative, TransUnion was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

121. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

122. WHEREFORE, Plaintiff prays for judgment as follows:

   a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

   b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

   c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

   d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

   e. For determination by the Court that Defendants' policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

   f. For determination by the Court that Defendants' policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: June 29, 2022

*/s/ Kyle Schumacher*
Kyle Schumacher
kyle@schumacherlane.com
P.O. Box 558
Spring Branch, TX 78070
503-482-8137 ph
210-783-1383 fax
Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial of this matter by jury.

                                                             **SCHUMACHER LANE PLLC**

Dated: June 29, 2022                                */s/ Kyle Schumacher*
                                                               Kyle Schumacher
                                                               Attorneys for Plaintiff